RENE LA ROCHE AND MARY, HIS WIFE, INEZ R. ELLIS, STEPHEN P. ELLIS, AND THOMAS LA ROCHE ELLIS, MINOR HEIRS OF THOMAS G. ELLIS, DECEASED, BY THEIR GUARDIAN AD LITEM, CHARLES G. DAHLGREN, PLAINTIFFS IN ERROR, *v.* THE LESSEE OF RICHARD JONES AND WIFE.

After the cession by Georgia to the United States, in 1802, of all the territory north of 31° north latitude and west of the Chatahoochee River, Congress passed an act (2 Stat. at Large, 229) confirming certain titles derived from the British or Spanish governments, and appointing commissioners to hear and decide upon such claims, whose decision was declared to be final.

In 1812, another act was passed (2 Stat. at Large, 765) confirming the titles of those who were actual residents on the 27th of October, 1795, and whose claims had been filed with the Register and reported to Congress.

La Roche et al. v. Jones et al.

A grant of land on the north side of latitude 31, issued in 1789 by the Governor-General of Louisiana and West Florida, was void, because the United States owned all the country to the north of latitude 31, under the treaty of 1782. Consequently, no title to land so granted could pass by descent.

But the subsequent legislation of Congress conferred a title emanating from the United States, and vested it in the person to whom the commissioners awarded the land.

This title is conclusive against the government, and a court of law cannot now inquire into previous facts, in a collateral action, with a view of impeaching that title. It is equivalent to a patent.

THIS cause was brought up, by writ of error, from the Circuit Court of the United States for the Southern District of Mississippi.

It was an ejectment brought by Richard Jones and wife, against the plaintiffs in error, to recover eight hundred acres of land in Wilkinson County, in the State of Mississippi.

The suit was brought in 1823, and in 1825 a verdict was rendered, by agreement, in favor of the plaintiff, subject to the opinion of the court upon the whole facts in the case. The judgment of the court below was in favor of the plaintiff.

The facts in the case are all recited in the opinion of the court, and need not be repeated.

It was argued by *Mr. Gilpin* and *Mr. Walker*, for the plaintiffs in error, and *Mr. Lawrence* and *Mr. Morehead*, for the defendants in error.

The counsel for the plaintiffs in error contended, —

It is incumbent on the plaintiff below to establish a right of possession of the tract in question, existing in himself, or those under whom he claims, on the 6th of August, 1823, founded on a legal title ; and it is immaterial, as to his right to recover, whether the title be in the defendants or not. Love *v.* Simms, 9 Wheaton, 524 ; Cincinnati *v.* White, 6 Peters, 441.

Does the evidence of the plaintiff, in the record, exhibit such a title ? It does not.

I. The plaintiff's evidence admits that William Cocke Ellis never was in possession of the tract in question. He left the Mississippi Territory in 1784 or 1785; went to Virginia; never returned from there; and died there in 1790. The certificate of survey of the tract in question bears date 11th February, 1789. This is the first evidence of his title. It is four or five years after he had left the Mississippi country and become a resident of Virginia. The existence of a previous warrant of survey is known only by a recital, unaccompanied with any description of the land, or any application for or receipt of it by him. There is no evidence of the knowledge, acceptance, or possession either of the warrant of survey or grant, or of the

tract of land itself, by any person for William Cocke Ellis, or by or on behalf of his child or wife.

It is admitted by the plaintiff's evidence that it was claimed and held by Richard Ellis in 1792; and by John Ellis, from whom the defendants claim, in 1795; both holding in, and asserting, their own right, adversely to the claim of the lessors of the plaintiff. These facts are fatal to the plaintiff's right of recovery. Taylor *v.* Horde, 1 Burr. 119; Lewis *v.* Price, 2 Saund. 175 (note).

II. The claim, therefore, of Mary Jones (formerly Ellis), the plaintiff's lessor, is made, for the first time, in 1823, and it rests exclusively on the alleged Spanish grant of 16th February, 1789, unaccompanied by any entry, possession, or previous claim. Even if it were not invalid on the grounds already stated, it would still be so, unless, —

1. The Spanish grant vested a valid title in William Cocke Ellis, her husband, which descended to her by act of law, or was devised to her by him. Or,

2. The compact between the United States and the State of Georgia, and the legislation of the United States consequent thereon, vested such a title in her.

Now neither of these occurred.

1. The Spanish grant vested no title.

It was an exercise of authority over territory not belonging to Spain, being north of 31° N. Lat. Whatever doubt existed before 1795 was removed by the treaty of that year, by which Spain admitted that line to be her northern boundary. (8 Stat. at Large, 146.) Repeated judicial decisions sustain this, both of the courts of the United States and of Mississippi.

In the case of Fletcher *v.* Peck, 6 Cranch, 87, 142, the Supreme Court sustained the validity of a patent, granted by the State of Georgia, on the 13th January, 1795, for a body of land in Mississippi Territory north of 31° N. Lat.

In the case of Harcourt *v.* Gaillard, 12 Wheaton, 523, a grant by a British Governor of Florida, after 1776, of a tract in the Mississippi Territory, north of 31° N. Lat. is held to be invalid as a foundation of title.

In the case of Henderson *v.* Poindexter, 12 Wheaton, 530, the Supreme Court expressly declares that no Spanish grant, after the peace of 1782, of land in the Mississippi Territory, north of 31° N. Lat., has any validity, but that holders must depend exclusively on their titles derived under the laws of the United States.

In the case of Ross *v.* Barland, 1 Peters, 664, the Supreme Court says, that the treaty of 27th October, 1795, settled the

line of 31° N. Lat. as the boundary between the United States and Florida.

In the case of Hickey *v.* Stewart, 3 Howard, 760, the Supreme Court distinctly examined the question as to the validity of complete Spanish grants, made in the Mississippi Territory by Spain, previous to the 27th of October, 1795, and pronounced them absolutely void. It went further; it declared the territory to belong to Georgia up to 1802, and therefore that titles deduced from that State were alone valid.

In the case of Pollard *v.* Files, 2 Howard, 602, the Supreme Court laid down the same principle in regard to the Florida treaty. The United States claiming the whole country as far east as the Perdido as part of Louisiana, and therefore ceded to the United States by the treaty of 1803, the Supreme Court declared all grants which Spain made within that territory to be void, and the court says that this had been so often settled (referring to Foster *v.* Neilson, 2 Peters, 254, and Garcia *v.* Lee, 12 Peters, 515), that it was no longer open to controversy.

In the case of Poole *v.* Fleeger, 11 Peters, 210, the Supreme Court applied the same principle, — as one not admitting controversy, — in conflicting claims to territory between the States of North Carolina and Virginia; it held a grant of land within it, by North Carolina, to be intrinsically void.

In the case of Nevitt *v.* Beaumont, 6 How. Miss. 237, the same ground, as to the total nullity of Spanish grants of land north of 31° N. Lat., is strongly affirmed; as it is in many other cases decided in that State.

The Spanish grant therefore gave no title to William Cocke Ellis. But if it did, his wife derived none from him either by limitation or conveyance. She could not claim by inheritance from her husband, for the Georgia law recognized no title whatever in her. The evidence she produces, not only fails to show any conveyance or devise to herself, but, on the contrary, it shows possession and assertion of adverse title, in 1792, in Richard Ellis, which he then asserted he had derived from William Cocke Ellis, and it admits a regular devise from Richard Ellis to John Ellis. Nor, if it could avail, is there any evidence whatever of descent, possession, or conveyance to her of this tract under the Spanish grant. Mary Jones, therefore, totally fails to establish any title under the Spanish grant to her husband.

2. Does she, then, show a title under the legislative acts either of Georgia or the United States?

That she must so do has been settled by repeated decisions.

In the case of Henderson v. Poindexter, 12 Wheaton, 530, the Supreme Court expressly held that, where a claimant claimed under a Spanish grant, north of 31° N. Lat., his title was utterly void unless it was confirmed by the compact between the United States and Georgia, or the acts of Congress of the 3d March, 1803, or 27th March, 1804 (2 Stat. at Large, 229, 303). In 14 Peters, 405, will be found Judge Baldwin's statement of the point thus decided in Henderson v. Poindexter.

In the case of Harcourt v. Gaillard, 12 Wheaton, 523, the Supreme Court decided that a British grant was equally unavailing to give title north of 31° N. Lat., but that it must be derived under the compact with Georgia or the acts of Congress.

In the case of Hickie v. Starke, 1 Peters, 98, the claimant produced a grant "legally and fully executed"; but the Supreme Court held it to be insufficient, and required that the person under whom the claim is made should come within the provisions of the compact between the United States and Georgia.

In the case of Hickey v. Stewart, 3 Howard, 760, the same doctrine is fully established, the previous cases being reviewed and confirmed.

The same rule has been established in regard to claims under the Louisiana and Florida treaties, though in those treaties there were confirmatory words in regard to the validity of existing grants, not found in the treaty of 1795. But acts of Congress being passed to carry these treaties into effect, — boards of commissioners being appointed, — the Supreme Court have held that the claimant, notwithstanding his grant, must bring himself within these laws.

In the case of Delacroix v. Chamberlain, 12 Wheaton, 601, the Supreme Court held a confirmation by the board of commissioners appointed under the act of Congress absolutely necessary.

In the case of Foster v. Neilson, 2 Peters, 314, the same point was decided, and Judge Baldwin (14 Peters, 411), while commenting on that case, and controverting some of its positions, regards this as established beyond a question.

In the cases of Garcia v. Lee, 12 Peters, 516 – 519, of Pollard v. Files, 2 Howard, 603, and of Les Bois v. Bramell, 4 Howard, 459, the rule is treated as one not open to question or dispute.

Has, then, Mary Jones shown a title under the acts of Congress, which declare what was requisite to give a title to land in the Mississippi Territory on 27th October, 1795?

What is thus required ?

1. Certain matters of fact made by law essential.

2. A confirmation by the board of commissioners appointed under that law.

What are these matters of fact, and is there any evidence of them in favor of Mary Jones? They are set forth either in the compact with Georgia (1 Laws of the United States, 489), or the act of Congress to carry it into effect (2 Stat. at Large, 229).

1. Actual residence on the 27th of October, 1795, in the Mississippi Territory, by the person in whose name the Spanish grant was issued, or the legal representative of such person.

2. Presentation of proof thereof to the Register.

Now, the whole evidence in the record, not only does not present this proof, but establishes the reverse. It shows, —

1. That William Cocke Ellis was dead before the 27th of October, 1795.

2. That Mary Jones was not his legal representative.

3. That, if she was his legal representative, she never, at any time, resided in the Mississippi Territory.

4. That she never presented any proof, or made any claim, before the Register or commissioners.

But if she had given evidence of these matters of fact, still this would give no title, unless her claim was presented to the board of commissioners, and confirmed to her, as being such representative, and the person then entitled to the tract. The act of 3d March, 1803, makes their decision on all the matters of fact necessary to establish a title as final and conclusive. It also makes a certificate of confirmation issued by them equivalent to a patent to the person in whose favor it is given.

1. This is apparent from the language of the act. See act of 3d March, 1803, § 6 (2 Stat. at Large, 230).

2. It is established by judicial decisions, as well such as directly relate to the Mississippi Territory, as those similarly made in other cases.

In the case of Brown *v.* Jackson, 7 Wheaton, 240, the Supreme Court gave full force to the act of the commissioners in the Mississippi Territory.

In the case of Ross *v.* Barland, 1 Peters, 665, 666, the Supreme Court says that no particular form of certificate is required; that it is sufficient if the proof is satisfactory to the board; and that nothing more is needed than their certificate to entitle the party, in whose favor it is given, to a patent.

In the case of Hickey *v.* Stewart, 3 Howard, 761, the language of the Supreme Court to this effect is still more decisive.

La Roche et al. v. Jones et al.

The same point has been repeatedly decided in other cases, arising under the decisions of other boards created for similar purposes. Polk v. Wendell, 9 Cranch, 99; S. C., 5 Wheaton, 303; Hoofnagle v. Anderson, 7 Wheaton, 217; Patterson v. Winn, 11 Wheaton, 384; Edwards v. Daly, 12 Wheaton, 206; Voorhees v. United States Bank, 10 Peters, 472.

Now, Mary Jones not only had received no such certificate, — not only has presented no such proofs, — but the board have deliberately decided, —

1. That the proof is, in their opinion, conclusive, to show that John Ellis was the legal representative of William Cocke Ellis; the tract having been proved to be "legally conveyed" to him.

2. That John Ellis was entitled to the land, according to the proofs and requirements of the compact with Georgia, and the acts of Congress.

3. That John Ellis was entitled to a certificate of confirmation, which was duly reported to Congress.

4. And John Ellis actually received a certificate of confirmation, under which he and his heirs have continued to hold the tract ever since the year 1805; as had been previously the case, without interruption, from 1795.

III. Nor can the lessor of the plaintiff, Mary Jones, avail herself of the possession of John Ellis, or those who claim under him, as enuring to her benefit.

It is shown by the facts to be an adverse possession. The tract was claimed by Richard Ellis as his own. It was so devised by him to John Ellis. It was so held by John Ellis. It was so presented to the board of commissioners. It was so confirmed and certified by them. It was so definitively confirmed and ratified by act of Congress.

There is no evidence whatever to show that any title, legal or equitable, in Mary Jones, was supposed to exist, or was in any manner recognized as existing, by the board of commissioners or by Congress. The law of Mississippi, at the time when this action of ejectment at law was instituted, positively declared that the perfect legal title was vested in John Ellis and his heirs, under the certificate of confirmation from the board of commissioners, ratified by Congress. Act of Mississippi of 28th June, 1822 (How. & Hutch. Mississippi Digest, p. 599).

Legal title, therefore, in Mary Jones there was clearly none, derived from the possession of John Ellis, or the confirmation to him. If it could be plausibly urged, — which it cannot, — that an equitable interest was vested in or inured to her by vir-

14 *

tue of such possession and confirmation, it is insufficient to maintain her present action, which must rest on her establishing a legal and possessory title, complete in herself, at the time her suit was instituted. Robinson v. Campbell, 3 Wheaton, 212.

The counsel for the defendants in error contended, —

1st. That Richard Ellis never had any title by descent to this land, either from his son or grandson. Upon the death of William Cocke Ellis, in August, 1790, with a full and complete legal title to the land in question, so far as the government of Spain could grant it, it undoubtedly became vested in his only child and heir, Richard Cocke Ellis, and in his wife, Mary Jones. It is well known that, after the American Revolution, the United States, Spain, South Carolina, and Georgia succeeded to the disputes of Great Britain, France, and Spain, relative to the country in which the land in question is situated. South Carolina claimed the country under the grant to the Lords Proprietors; Georgia founded her claim on the commissions to her governor, Wright; and the United States claimed it as a conquest from the British Province of West Florida. Spain contended that it was a part of Louisiana, and as such ceded to her by the treaty of 1783.

South Carolina relinquished her claim by the treaty of Beaufort to Georgia. There being no other territory in the United States than that of some one of the confederated States, the general government very properly abandoned its claim, and recognized the complete title in Georgia, by taking a cession of the country from that State. It has always been held by every department of the government, that the title and jurisdiction over this country was in Georgia alone, until this act of cession; that Spain held the country, and exercised jurisdiction over it wrongfully, and that the treaty between the United States and that nation does not import to be a cession of territory, but the adjustment of a boundary between the two nations.

This being the case, it is obvious that we must look to the laws of Georgia to define the rights growing out of the course of descent. The law of Georgia on this subject will be found in Marbury and Crawford's Digest of the Laws of Georgia, p. 217. The first section of the act referred to, after abolishing the distinction between real and personal estate of any person dying intestate, continues as follows: — "So that in case of there being a widow and children, or child, they shall draw equal shares thereof, unless the widow shall prefer her dower; in which event she shall have nothing further out of the real

estate than such dower; but shall, nevertheless, receive her proportionable part or share out of the personal estate. In case any of the children shall have died before the intestate, their lineal descendants shall stand in their place and stead: in case of there being a widow, and no child or children, or legal representatives of children, then the widow shall draw a moiety of the estate, and the other moiety shall go to the next of kin in equal degree, and their representatives. If no widow, the whole shall go to the child or children. If neither widow, child, or children, the whole shall be distributed among the next of kin in equal degree, and their representatives; but no representative shall be admitted among collaterals, further than the child or children of the intestate's brothers and sisters. If the father or mother be alive, and the child dies intestate, and without issue, such father (or mother, in case the father be dead, and not otherwise) shall come in on the same footing as a brother or sister would do. The next of kin shall be investigated by the following rules of consanguinity, that is to say: children shall be nearest; parents, brothers, and sisters shall be equal in respect to distribution, and cousins shall be next to them. The half blood shall be admitted to a distribution share of the real and personal estate, in common with the full blood." Act of 23d December, 1789.

From the above law, it is apparent that, upon the death of William Cocke Ellis, his widow and child, in the language of the act, drew equal shares of his estate.

The child, Richard Cocke Ellis, being entitled to one half the land in question, died an infant, without issue, and intestate, leaving a mother, but no father, brothers, or sisters. In such case the mother came in "on the same footing as a brother or sister would do." The rule prescribed for investigating the next of kin places children first, and then parents, brothers, and sisters. The infant R. C. Ellis, having no brothers, or sisters, or father, his mother, the present lessor of the plaintiff, succeeded him, and became his sole heir. The foregoing law continued in force over this country until the adoption of the ordinance of July 18th, 1787, for the government of the Territory of Mississippi, in 1798, and so far only as it may be considered modified by it, until March 12th, 1803, when the act of that date was passed, revised February 10th, 1806. See Hutchinson's Miss. Code, p. 623.

2dly. But the land in controversy is situated in the country which lies between the Mississippi and Chatahoochee Rivers, and between the 31st degree of north latitude to the south, and a line drawn from the mouth of the Yazoo River, due east, to

the Chatahoochee on the north. This being within the ac-knowledged limits of the United States, although Spain held and exercised jurisdiction over it until the treaty of the 27th of October, 1795, it is conceded that it has been properly decided by this court that all grants of land by her were invalid, unless embraced within the provisions of some one of the statutes passed by the Congress of the United States. The first act bearing upon this subject is that by which Georgia ceded her western territory to the United States. That act provides, "that all persons who, on the 27th day of October, 1795, were actual settlers within the territory thus ceded, shall be con-firmed in all the grants legally and fully executed prior to that day by the former British government of West Florida, or by the government of Spain." On the 3d of March, 1803, Con-gress passed "an act regulating the grants of land, and providing for the disposal of the lands of the United States south of the State of Tennessee"; and in March, 1804, a supplemental act was passed, both of which are commented upon at large in the case of Henderson v. Poindexter's Lessee, 12 Wheaton, 536, and need not be more particularly noticed at this point. In this case the court says, "It is not easy to resist the conviction, that the government has legislated on the idea that Spanish titles might be valid, though held by persons who were not res-idents of the country on the 27th of October, 1795."

In the subsequent case of Hickie v. Starke, 1 Peters, 94, the court remarks, "that the term *actual settler* seems to have been understood, in the case of Henderson v. Poindexter, as synonymous with resident of the country. That case, how-ever, did not require that the precise meaning of the term should be fixed, and the court is disposed to think that a settle-ment made on the land by another person, who cultivated it for the proprietor, would be sufficient, though the proprietor should not reside in person on the estate, or within the terri-tory." The settlement made in the case cited was on the 3d of December, 1795, by another person than the proprietor, but for him. "Had the settlement been made," says the opinion, "at the day required by the cession act, it would, we think, have satisfied the requisition of that act, and entitled the plain-tiffs in error to the benefit of the condition."

It will be remembered that this was a suit in chancery, and dismissed for the want of jurisdiction, because Hickie did not show that his patentee was a settler on the 27th day of Octo-ber, 1795. He afterwards, however, brought his action of ejectment upon his legal title, exhibiting a patent, dated 3d of April, 1794, issued by the Spanish governor of the Province of

Louisiana, and a certificate of the 10th of April, 1806, signed by the commissioners appointed under the acts of Congress of the 3d of March, 1803, and the supplemental act of the 27th of March, 1804, confirming to George Mather, from whom Hickie claimed, the said tract of land, by virtue of the articles of agreement and cession between the United States and the State of Georgia.

The case came again before this court, and may be found reported in 3 Howard, 750. The decree in chancery, which had been brought before this court for revision, and dismissed for the want of jurisdiction, on the ground before stated, was relied upon as a bar to the recovery in ejectment. This court decided it was no bar, and reversed the judgment of the Circuit Court. It will be borne in mind, that the patentee was not a resident of the territory, and did not cultivate the land by another at the period prescribed in the act of cession by Georgia, but that the first actual settlement was by his agent, Williams, on the 3d of December, 1795.

From these cases it may be considered as settled, that all Spanish grants legally and fully executed prior to the 27th of October, 1795, though the grantee was a non-resident of the territory, and had not cultivated the land by another, are valid, if laid before the commissioners for their action under the laws of 1803 and 1804, before referred to.

The grant which is the foundation of the present action was legally and fully executed prior to the 27th of October, 1795, but the grantee, William Cocke Ellis, seems not to have been in the country from about 1784 or 1785 up to the period of his death in 1790, and his widow, the present lessor of the plaintiff, never was in the country. In the absence of William Cocke Ellis, his survey seems to have been made, certified, and the grant issued upon it. His father or brother, John Ellis, probably acted as his agent. It is respectfully contended, that the act of confirmation to John Ellis inured to the benefit of the legal title, without vesting it in him. Without urging the impropriety of his disavowal of his fealty to his principal, if at any time he had acted as his agent, it may be assumed as established, that all the acts of Congress on the subject of grants within the disputed territory, which were legally and fully executed prior to the 27th of October, 1795, presuppose that the legal title was full and complete in the grantee. See 12 Wheaton, 528, &c.; and The Lessee of Pollard's Heirs *v.* Kibbe, 14 Peters, 406, where it is said that "the articles with Georgia were in themselves a confirmation of titles within its provisions, protected by them and confirmed by them." The

third section of the act of cession speaks of "grants herein before recognized." The act of the 3d of March, 1803, before cited, after providing for three other classes of claimants not embraced in the act of cession, establishes a board of commissioners for the confirmation of claims, and declares the legal effect of a certificate of confirmation of a grant fully executed to be "a relinquishment for ever, on the part of the United States, to any claim whatever to such tract of land." In the other cases, the holder of the certificate thereby becomes entitled to a patent for the land. See sixth section of the act of 1803. The act of 27th March, 1804, while in its third section it uses more comprehensive language, brings whatever additional claims may be embraced by it within the operation of the act of 1803, to which it was a supplement.

What, then, was the legal effect of the certificate of confirmation to John Ellis? We have shown that the legal title passed to Richard C. Ellis, the infant heir of William C. Ellis, and to his widow, now Mary Jones; and that, upon the death of Richard C. Ellis, his title passed to his mother, so that she became the legal proprietor of the land in question.

Under the act of the commissioners, there was no transfer of the legal title. The act itself did not purport to vest the legal title. It amounted to a simple relinquishment of the claim of the United States, leaving the legal title where the law had previously vested it. If John Ellis should institute an action of ejectment, could he show such a legal title as would entitle him to recover? It is apprehended that it would scarcely be gravely argued that he could. He procured the relinquishment of the claim of the United States to a grant of land, legally and fully executed. That relinquishment must attach itself to the legal title, wherever that may be. It is based, it is true, upon the hypothesis, that such title was in him, but it has not the effect of vesting such title in him when it was in another. The confirmation inured to the benefit of the title, wherever it was. Had the title been inchoate, the act of confirmation would have entitled the claimant to have the legal title consummated in himself, by having a patent issued in his name. But even in such case it is supposed, upon a proper case made out, the real owner of such inchoate title might, by a suit in chancery, obtain the relinquishment of such title. But whether this be so or not, both parties claiming under the same title, the act of confirmation must be united with the title, wherever it may be. The law declares what shall be the effect of the act of confirmation of a grant legally and fully executed. The grant is recognized as the legal title, and the act of confirma-

tion a mere relinquishment of the claim of the United States. The title draws to itself the relinquishment, and remains where it did before the act of confirmation.

The reasons for requiring full and complete grants to be laid before a board of commissioners are obvious, as justly remarked by this court in the case of Henderson v. Poindexter's Lessees. " The legislature," says the court; " was making provision for the sale of vacant lands within the ceded territory, and it was deemed necessary to ascertain the particular lands which were appropriated." The confirmation, in the name of John Ellis, of the grant made to William Cocke Ellis, effected all that was intended by the law. It ascertained the particular land which had been appropriated, and confirmed the title. It did not change the legal title, or transfer it from the person in whom it was vested to the one who procured the confirmation. The intention of the law was fulfilled, its object fully accomplished, and the confirmation inured to the benefit of the holder of the legal title, whoever he might be.

Mr. Justice CATRON delivered the opinion of the court.

The original suit out of which this writ of error arises was an action of ejectment, brought in the District Court of the United States for the District of Mississippi, at October term A. D. 1823, by John Doe, lessee of Richard Jones and Mary, his wife, citizens of Kentucky, against Thomas Ellis and Mary Ellis, to recover a tract of land in Wilkinson County. in the State of Mississippi, alleged to have been originally granted by the Spanish government to William Cocke Ellis, by a patent dated 16th February, 1789. It was admitted that the defendants were in possession of the tract of land in question; and that the land described in the Spanish grant, and in the declaration in this suit, were the same.

The proceedings in the case, and the facts as exhibited in the evidence offered by the plaintiffs, — no evidence being offered by the defendants, — are as follows.

In the year 1773 or 1774 Richard Ellis removed from Amelia County, Virginia, to the Mississippi country, then claimed and occupied by Spain as part of Louisiana and West Florida, where he continued to reside till his death, in 1792.

Richard Ellis was accompanied by two sons, — John Ellis, the grandfather of the defendants, and William Cocke Ellis, who afterwards married Mary Jones, the lessor of the plaintiff.

John Ellis continued to reside in Mississippi till his death in 1808.

William Cocke Ellis returned to Virginia about the year

1784 or 1785, and continued to reside there till his death, in 1790, never having gone back to Mississippi.

On the 11th of February, 1789, Trudeau, the Surveyor-General of Louisiana and West Florida, issued a certificate of survey, with a figurative plan, of a tract of land of eight hundred square arpents on Buffalo Creek in the district of Natchez, "in favor of Don William Cocke Ellis; the delimitation (measurement) having been made by virtue of the decree of his Excellency, Don Stephen Miro, Governor-General, under date of 20th March, 1783."

On the 16th of February, 1789, a grant of the said tract, which was stated to adjoin land of John Ellis, was made to William Cocke Ellis by Governor Miro, "in order that, as his own, he might dispose and make use of it."

The situation of the tract is north of the 31st degree of latitude, in the former county of Adams and present county of Wilkinson, in the State of Mississippi.

On the 2d of April, 1789, William Cocke Ellis, who was then residing in Virginia, married Mary Cocke, afterwards Mary Jones, and lessor of the plaintiff.

In January, 1790, William Cocke Ellis and Mary, his wife, had a child born, who was named Richard Cocke Ellis.

In August, 1790, William Cocke Ellis died in Virginia, intestate; leaving his wife, Mary Ellis, and his child, Richard Cocke Ellis, surviving him, and residing in Virginia.

In April, 1791, the child Richard Cocke Ellis died in Virginia, an infant.

On the 17th of October, 1792, Richard Ellis (of Mississippi) made his will, wherein he devised to his son John Ellis the tract of land in question, and died shortly afterwards.

On the 2d of July, 1795, Mary Ellis (widow of William Cocke Ellis) married, in Virginia, Richard Jones, lessor of the plaintiff, and they continued to reside in Virginia.

On the 27th of October, 1795, by the treaty between the United States and Spain, the latter admitted the parallel of 31° N. Lat. to be the north boundary of the Spanish possessions, — as it had always been claimed to be by the United States since the treaty of peace in 1782, where it is so expressly declared (8 Stat. at Large, 138).

On the 7th of April, 1798, an act of Congress established the Mississippi Territory, bounded on the south by 31° N. Lat., and constituted a board of commissioners to receive a cession from Georgia of her territory west of the Chatahoochee, and north of 31° N. Lat., and to adjust all differences in regard thereto (1 Stat. at Large, 549).

On the 24th of April, 1802, an agreement was made between the United States and Georgia, and a cession by Georgia of all claims to territory north of 31° and west of the Chatahoochee. It was therein expressly covenanted, that all persons who were, on the 27th of October, 1795, actual settlers within the territory ceded, should be confirmed in their grants made by the Spanish government before that day (1 Laws of the United States, 489).

On the 3d of March, 1803, an act of Congress was passed (2 Stat. at Large, 229) which provided that, —

1. All persons, and the legal representatives of persons, who were resident in the Mississippi Territory on the 27th of October, 1795, who had before then received from the British or Spanish government a warrant or order of survey, and who on that day actually inhabited and cultivated the land in the warrant; should be confirmed in their titles if they were twenty-one years of age, or heads of a family, at the date of the warrant.

2. All persons, and their legal representatives, who, at the time of the Spanish evacuation in 1797, were twenty-one years of age, or heads of families, and actually inhabited and cultivated a tract of land in the Mississippi Territory not claimed under the preceding section or any British grant, or the agreement with Georgia, should be entitled to a donation of such tract.

3. All persons, and their legal representatives, who, at the time of passing this act, were twenty-one years of age, or heads of a family, and inhabited and cultivated a tract of land in said territory not claimed as aforesaid, should be entitled to a pre-emption right therefor.

4. All persons claiming lands by virtue of the preceding sections, or of a British grant, or under the agreement with Georgia, were required to file their claims and evidence with the Register, before the 31st of March, 1804, and if this was not done, all their right was for ever barred.

5. Commissioners were appointed to ascertain the rights of persons claiming under the agreement with Georgia, or under this act; they were to hear and decide, in a summary manner, all matters respecting such claims; and to determine them; and their determination, so far as the right was derived under the agreement with Georgia or the acts of Congress, was declared to be final. They were to give certificates to claimants who should appear to them entitled, stating that they are confirmed in their titles thereto; which certificate, being recorded, was to be a relinquishment for ever of all claim on the part of the United States.

Thereupon John Ellis presented and filed his claim to be confirmed in the tract of land in question.

By indorsement on the original Spanish grant in this case, it appears that it was duly recorded in the Register's book C of written evidence of claims, folio 534.

He also produced and filed the will of his father, Richard Ellis, dated 17th October, 1792, devising the tract to him.

On the 19th of June, 1805, his title thereto was absolutely confirmed, and a certificate of confirmation was issued by the commissioners "to John Ellis, for the tract mentioned in the Spanish grant, dated 16th February, 1789, to William Cocke Ellis," and which had been, as they certified, "legally conveyed to the said John Ellis."

On the 3d of July, 1807, the report of the commissioners was made to the Secretary of the Treasury, stating, among others, the confirmation of the tract in controversy to John Ellis; and on the 2d of January, this, with numerous other reports on the Mississippi land titles, was reported to Congress. (See Gales & Seaton's documents, Public Lands, Vol. I. p. 868.)

On the 30th of June, 1812, an act of Congress was passed, which declared that all persons, and their legal representatives, claiming lands in the Mississippi Territory under British or Spanish warrants or orders of survey, granted before the 27th of October, 1795, who were actual residents on that day, and whose claims had been filed with the Register and reported to Congress, were thereby confirmed in the lands so claimed, and should receive patents. (2 Stat. at Large, 765.)

On this state of facts, it was submitted to the Circuit Court whether the lessor of the plaintiff (Mary Jones) could recover; that court having pronounced her title legal and valid, judgment was rendered for the plaintiff, and the only question presented for our consideration is, whether that judgment was a proper conclusion of law on the facts agreed by the parties. That the grant of 1789, made by Miro, Governor-General of Louisiana and West Florida, was void for want of power in the Spanish authorities to grant lands north of the thirty-first degree of north latitude, is not open to controversy at this time. It was so held in Henderson *v.* Poindexter, 12 Wheat. 539, and again in the case of Hickey *v.* Stewart, 3 How. 756, and the same doctrine has been affirmed in several other cases. It necessarily follows, that on the death of William Cocke Ellis in 1790, his infant son Richard took no title by descent; nor did the mother of Richard take any title by descent on the death of her son in 1791. Her right to recover must therefore

La Roche et al. *v.* Jones et al.

depend on the compact between the State of Georgia and the United States of 1802, or on the legislation of Congress. The compact only provided for persons who actually inhabited and cultivated the land claimed on the 27th of October, 1795, and the lessor of the plaintiff, not having done so, was not provided for; and, in the next place, Congress intended by the act of 1803 to confer United States titles on claimants, and to this end instituted a board of commissioners, with powers to adjudge on the facts, whether such claim as was recognized by the compact existed, and who the proper claimant then was, whether by assignment or otherwise; and, especially, to ascertain and decide whether the land claimed had been actually inhabited and cultivated by the person who preferred the claim, on the 27th of October, 1795. On the necessary facts being found to satisfy the compact, and the act of Congress, the land was adjudged to the applicant, and a certificate of the judgment was delivered to him; which, on being recorded, divested the title of the United States, and vested it in the individual in whose favor the judgment was given. And this title is conclusive as against the government; nor can a court of law inquire into previous facts, reaching behind the judgment given by the commissioners, thereby to impeach its validity; as this would be assuming jurisdiction to overthrow that judgment in a collateral action. As a source of individual title, the judgment and recorded certificate stand on the foot of a patent, and merge all previous requirements, and all future inquiry into such requirements, when the grant is relied on, as here, in defence of an ejectment. John Ellis's heirs having the conclusive legal titles, Mary Jones has no standing in court: and such, in effect, is the decision of Hickey *v.* Stewart. We deem the judgment then pronounced conclusive of the present controversy, and, for the reasons then given and here given, order, that the judgment of the Circuit Court be reversed, and that one be entered for the defendants below, and plaintiffs in error here.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of Mississippi, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to enter a judgment in this cause in favor of the defendants in that court and plaintiffs in error here.