# REPORTS

OF

# CASES ARGUED AND DETERMINED

## AT JUNE TERM, 1852.

### CHASTANG'S HEIRS vs. ARMSTRONG.

1. A title to land situated within the Territory of Louisiana, which was confirmed under the third section of the act of Congress of May 8, 1822, derives its validity and vitality from the act itself, and not from the subsequent location and survey, which the Register and Receiver was authorized to make under the fifth section of the act.
2. Such a title is a legal title, and is sufficient to maintain an action of ejectment.
3. The act of Congress vests the title in those who are alleged to be the claimants in the application to the Commissioner, and according to their interest as therein propounded.
4. Where a claimant, as executor of his father's will, made application to the Commissioner, "on behalf of himself and the other legatees" therein named, praying that he might be confirmed in his claim, and the Commissioner having reported favorably to the claim, the same was afterwards confirmed by the act of Congress, the title vests in all the devisees of the testator, and they may maintain ejectment.
5. Where two different claims to the same tract of land are confirmed by the same act of Congress, the title of the Government can pass but to one of the confirmees; and if it be admitted that one has a perfect title, it follows that the other can have none at all.

ERROR to the Circuit Court of Mobile.

Tried before the Hon. John Bragg.

This was an action of ejectment brought by Chastang's Heirs against the defendant in error, to recover a certain lot situated in the city of Mobile. The case is a branch of Doe

*ex dem.* Chastang v. Dill, reported in 19 Ala. Rep. 42. For a full statement of the facts reference can be had to that case. The titles, under which the parties respectively claimed, are also stated at length in the opinion of the court.

JOHN A. CAMPBELL, for plaintiff in error.

In 1814, Basil Chastang, testamentary executor of John, on behalf of himself and the other legatees of his father's will, presents his title under the act of 1812, to Commissioner Crawford. He bounds his lot definitely by public monuments (streets and distances thereon.) It can be precisely ascertained. He rests his claim on the fact that the land has been occupied for thirty-two years, and that the title deed has probably been lost by time or accident. The will of his father is appended to the petition.

The commissioner reported in favor of the claim, and it was confirmed under the third section of the act of Congress, of 8th May, 1822, relative to claims in Mobile. The lessors of the plaintiff claim under the title of their father, confirmed to his legatees by this will.

Two objections are raised upon this claim. 1st. The defendants say no right is represented, except that of Basil Chastang. He is a trustee for the legatees. The claim is made as a representative—the will of John Chastang is presented, and the rights of the legatees presented. Suppose a title had been drawn, what would have been its form? Whereas, Basil Chastang, on behalf of himself and the other legatees of his father under the following will, asks the confirmation of their rights under the same, now we do hereby ratify and confirm the same.

We know that the patent from the Land Office would have been in favor of the "legal representatives of John Chastang." Such are the instructions found in the published decisions of the Government. 1 Instructions and Opinions, 48–741–752.

The Government creates no trusts. It confirms upon the claim presented, and confers title according to the claim and evidence. It requires the production of the mesne conveyances for the very purpose.

Basil Chastang makes no claim for himself alone. He presents the claims of others, as well as his own, and declares

his agency. These notices are not to be nicely and technically construed, but to be construed so as to carry out the policy of the Government and the intentions of the claimant. The intention of Basil Chastang was, simply to ask the Government to confirm the title enjoyed under the will of his father to the objects of his bounty.

This purpose is definitely expressed. The object of the Government is to confirm to those who have the pre-existing rights. These are disclosed in Basil Chastang's notice, and he says he acts for the persons who hold those rights. It follows, therefore, that the confirmative act will be distributed so as to fortify the inchoate titles of each of the legatees, as they are shown by the will.

The act of 1812 (4th section) provides, "that every person claiming lands" in the district west of the Perdido and east of the island of New Orleans, under any grant, order of survey, or other evidence of claim, should deliver to the commissioner of claims a notice in writing, *stating the nature and extent of his claims*, together with a plat (in case a survey shall have been made,) of the tract or tracts claimed; and shall deliver every grant, order of survey, deed, conveyance, or other evidence of his claim, to be recorded, &c. 1 Land Laws, 606.

The commissioner was required to inquire into whatever might effect the justice of the claim. He was required to make abstracts of the claims and of the evidence, and to report to the Secretary of the Treasury, that they might be submitted to Congress.

This duty was performed in regard to this claim. The notice set forth the exact limits of the lot; that it had been occupied for many years, and that the original grant had been lost. Congress, by act of the 8th May, (3d section,) employs this language: "That all claims reported, founded on private conveyances which had passed through the office of the commandant or other evidence, but founded, as the parties allege, on grants lost by time or accident, recommended for confirmation, shall be confirmed in the same manner as if the titles were in existence: *Provided*, That when the quantity claimed is not ascertained, no claim shall be confirmed for more than 7,200 feet."

What is meant by the words "claim" and "as if the titles

were in existence?" The word claim does not refer to the statement in the abstract. That is not the claim of the party, but merely a description of the claim he had preferred. The claims referred to are obviously those contained in the notice, and supported by the evidence, which have been embraced in the report of the commissioner. The government confirmation operates upon the claim as it has been exhibited in the notice, and supported by the evidence accompanying it.

When the notice and evidence ascertain the quantity, the claim is fully ratified. When it does not, only 7,200 feet are allowed. The precise effect given to the confirmation is expressed. It is, to establish the claim as if the titles were in existence. It will be seen that the claim of Basil Chastang meets every requisition of the act. The allegations of the notice show that the grant has been lost; that thirty-two years of occupation has existed; and that the quantity is definite. The claim, then, is confirmed as if the titles were in existence. The question arises, what titles? The answer must be, those described in the notice, and whose existence was made probable by the evidence.

It is supposed that the title does not become complete till the survey and location are perfected. The 5th section empowers the Register and Receiver to direct the location and survey. And when there are conflicts, the authority is given to the same officers to decide them according to the one or the other of two rules: 1st. To respect the lines agreed on between parties; but if there have been none such, then to divide the land, unless one had trespassed on the claim of the other.

No other mode of proceeding in the case of conflicting locations is to be found in the act. 1 Land Laws, 824, § 4.

The question then plainly arises, whether the title of the plaintiff is dependent upon the location and survey, or whether the act was sufficient. In the argument in Dill's case, a patent was declared to be necessary, and the same argument was submitted to the Supreme Court of the United States in the case of Farmer's Heirs v. Eslava. The court in that case decided between confirmed titles; one of which had been prosecuted to the issuing of a patent, and the other had only been surveyed and certified. The court say, "*that the*

Chastang's Heirs v. Armstrong.

*patent gives no title to the patentee superior to what a confirmation had given.*" The court recognizes the importance of the pre-existing right under the Spanish government. It says: "A certificate of confirmation, such as Eslava had, is very different from a certificate of purchase, *as the former shows that the legal title has already passed*, while the latter is merely evidence that it ought to be passed. A patent is necessary to complete the legal title in the *last case*, but *not in the first.*" 9 Howard, 446–447.

The court in this case shows no countenance to the doctrine of the necessity of a patent survey or location. In that case the Land Office had overruled Eslava's right, and upon that opinion had excluded Eslava, but the court held that the conflicting rights were not in the cognizance of the officers of the Land Office. 9 Howard, 449.

The whole argument in this decision indicates strongly that the court considers the title as complete by the act of Congress, and that the proceedings subsequent between adverse claimants do not conclude as to title.

The question came up in the case of Stoddard v. Chambers. It will be found stated in the argument of counsel. 2 Howard, 307, 3d point. The facts of the title will be found stated in the argument of Ewing, 307. The court say, in that case : "A confirmation by act of Congress vests in the confirmee the right of the United States, and a patent if issued could only be evidence of this." No stress is laid upon the fact that there had been no official survey.

In Chouteau v. Eckhart, the Supreme Court says : "The plaintiff's title is *prima facie* a good legal title, and will support an ejectment, on the act of 1836, *standing alone*, if the land can be identified, as confirmed, without resort to the patent." This court held in Strother v. Lucas, 12 Peters, 454, "that a grant may be made by a law, as well as a patent pursuant to a law, is undoubted, and a confirmation by a law is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo.*" 2 How. 372–3.

The language of the act of 4th July, 1836, provides that the decisions of the recorder of land titles in favor of land claimants, under a particular act, as entered in the transcript of decisions transmitted to the General Land Office, and which had been laid before Congress, be confirmed.

The principle of these decisions is carried to their full extent in the case of Ladiga v. Roland. It was held, that a right to a reserve conferred by a treaty with the Creek tribe of Indians did not stand in need of location to perfect the right of the reservee, although the treaty provided for the locations and selections. 2 Howard, 581.

The efficiency of laws in conferring legal rights against patents or other evidences afforded by the executive departments of the government, will be further shown by the cases reported. 9 Howard, 314, 333.

The decisions in our own court upon this subject, are equally to the point. The remarks of Judge Ormond, in the 7 Ala. Rep. 556, are pertinent and well considered, and seem to have been written in an exact conception of the character of these titles.

It being then apparent that the acknowledgment of the claim of the plaintiffs by the government as legitimately founded, and its declaration that it should be confirmed as if the titles were in existence, brings us to the consideration of the second branch of the statute.

What is the effect of the confirmation on the location of the lot ?

The provision of the act of 1822 is, that in all such claims, where the quantity claimed is not ascertained, no one claim shall be confirmed for more than 7,200 feet.

Where, then, do you look for the ascertainment of the quantity ? You look to the notice of the claim, to the evidence upon it. These are required to show the quantity, and to identify the claim for the inquiries of the government.

The powers given to the commissioner by the 5th section of the act of 25th April, 1812, for examination are plenary. He is authorized to ascertain " every other matter respecting said claims which may effect the justice or validity thereof."

When, therefore, the claim is ascertained in the notice and record of the commissioner, the confirmation operates upon it as there exhibited. The officers of the Land Office have no option in regard to the survey and location, except to follow the title confirmed.

The case of Mackay v. Dillon, 4 Howard, 421, arose under the act of 13th June, 1812, relative to Missouri. The act

does not operate upon a report or evidence, but upon the rights, titles and claims of portions of lots possessed, cultivated or inhabited prior to the 20th December, 1803; the confirmation is according to their respective rights.

This quality of the act is directly referred to by Justice Catron in his opinion. 4 Howard, 446. The court in this case, for the reason that no survey or evidence was adopted by the act, held, that an instruction holding a private survey to be conclusive was wrong. But in the case following, even under this act, which in no manner refers to a claim as made to the Land Office, or to the evidence adduced in its support, the court held that the land could be identified by a private survey. Judge Catron, on page 462 of the case, refers to this point. He says: "The second instruction given by the Circuit Court was, that the notice of claim filed with the Recorder and exhibited to the board, was evidence of the extent of said claim to commons. The competency of the evidence was not objected to on part of the plaintiff. It was such as she herself resorted to for the establishment of the extent and boundary of her own claim, and aside from the legal and official survey of the commons made in 1832, is the only evidence of boundary that is likely to exist at no future distant day, and was the usual evidence introduced to prove the fact be-before the survey of 1832 was made. The court gave no opinion on its effect, but properly left it to the jury. The language of the instruction thus approved is as follows: "That the notice of claim of said inhabitants as filed with the recorder of land titles, and exhibited before the board of commissioners, read here to the jury, is evidence of extent of solid claim to said commons." 4 Howard, 455.

The case of Bissell v. Penrose, which proceeds entirely on the effect of an act of Congress upon the evidence submitted, will be found to maintain the view that we are now presenting to the court. That when the quantity is ascertained by the claim and the evidence adduced to support it, the confirmation operates at once to vest the entire estate in the confirmee. In this case the court say: "The case before us depends upon the construction of our acts of Congress disembarrassed from any inquiries into the origin of the grants, or into the rights and principles upon which they

were founded, or which made it the duty of the government
under the treaty to acknowledge them.   Inquiries of this
kind were closed on the confirmation of the grants by the act
of 1836.    The title then became complete.    It became an
American, not a Spanish, title."   The court then proceeded
to declare that a private survey identified the land, preserved
it from other claims, and that the act of Congress ratifying
the claim entitled the confirmee to it according to the survey.

We then find from these cases that they are regulated by
the phraseology of the acts of Congress, and determinable in
some manner, by the circumstances of the case.   We have
found that the powers given to the land officers do not effect
contradictory rights, but simply as to disputed boundaries.

The register of locations is nothing, *till acted on*.   We did
not accept of the location, nor is it in evidence.

In this case the question is stripped somewhat of its diffi-
culty by the aspects of the defendant's title.

The defendant comes in as a donation claimant.   He pre-
sents no title to the justice of the government; no obligation
to bind its conscience.   The United States has continually
recognized its duties to the inhabitants transferred to them,
and that the perfection of inchoate or imperfect titles was a
matter of conscientious obligation.   This principle runs through
a large series of acts of Congress, and it is declared and ex-
pounded in the decision reported in 12 Peters, pp. 435–6–7–8.

The United States then, in recognizing the title or "claim"
of Chastang as founded on a Spanish grant, having definite
dimensions, created an estoppel against itself and all persons
claiming through it.   The acknowledgment applies as well to
the extent as to the validity of the claim.   The United States
could not have intended to open a litigation between itself or
those claiming from it, and the ancient inhabitants, or to arm
by donations or sales its own citizens with means of vexation
to them.   "They had in object to ascertain what belonged
to the United States, so that sales could be safely made, the
country settled in peace, and dormant titles not be permitted
*either to disturb ancient possessions;* to give to their holders the
valuable improvements made by purchasers, or the sites of
cities, which had been built by their enterprize."   12 Peters,
448.

The great object was to settle by act of Congress the title upon an American basis, after previous examination. The estoppel, then, created by the action of the government, is complete against the defendant's donation title.

The charge of the court below assumes the superiority of our paper title.

The point of difficulty lies in its interpretation of boundary.

We say that the acknowledgements of Congress are, 1st, That there was a grant; 2d, That it covered a particular and ascertained lot; 3d, That John Chastang was the grantee; 4th, That the title had been devised according to the will exhibited with the petition.

We say that this acknowledgment of the political department of the government operated as an *estoppel* upon it and the *donation* claimants, under the 4th section of the act, and the persons who might derive title from them, to deny these facts.

If a government survey would be conclusive of boundaries, would not this acknowledgment of limits be quite as authoritative as a survey—not between another Spanish claimant and Chastang—but between the United States and him who is to receive their grant as a donation?

The Supreme Court of this state has once declared, and Judge Ormond has dropped the dictum, that the interest of the donee did not vest till the grant. 16 Ala. Rep. 239.

The donation is prospective, while the confirmation operates on an existing claim and validates it. 2 Howard; 8 Howard S. C. Rep. 313; 7 Ala. 556.

An acknowledgment of the same facts, *under seal*, viz: the existence and loss of a grant, lost by time, or possession for thirty-two years of possession under title, with a confirmation as if the titles were in existence; would constitute such evidence as would support an ejectment. How much more is this the case when these acknowledgments are found in an act of Congress.

The defendants in error contend that the lessors of the plaintiff below do not connect themselves with the title of John Chastang. The will of John Chastang is a part of Basil Chastang's application, and is made the foundation of the

39

claim. Congress has affirmed the validity of that will and the capacity of the parties to take under it. It is as if the United States had taken the names and estate of the devisees and noted them in the act. The recitals created an estoppel against the United States and all parties claiming under the United States. 12 Peters, 454–458. The title is an American grant, and the evidence submitted loses its value after the United States has adopted and acted on it. The evidence operated as an inducement to the government to act, but the act is valid not in consequence of the sufficiency of the inducement, but the fullness of the power of the United States. The act of Congress "merges all previous requirements and all further inquiries into such requirements when the grant is relied on," &c. 9 Howard S. C. Rep. 155–371.

The question now comes as to the statute of limitations. Louison received the lot from Dr. Chastang's devise. He had been in possession for upwards of thirty years, the longest period of prescription under the Spanish law. This possession was held under a legitimate government, from 1780 to 1800; and under the *de facto* governments after. The title was one protected by the Louisiana treaty. The United States never sought to divest these rights, but to establish them as they were held under the laws and usages of the former governments.

Louison had a life estate. No person ever trespassed on the possession of Chastang. No adverse right was ever pretended against him. The first interruption was after his death. The statute of limitations might run against her life estate, but not against those who hold in remainder. 4 John. Rep. 390; 5 Cowen, 103; 3 B. & C. 757; Tillinghast Adams, 57. The defendant in error insists that the legal title was in Basil *for the use* of the legatees. The United States cannot be supposed to create such estates, and if they did, the statute of uses of Alabama, in this case, would execute the use.

What rights were placed before the government? They were those derived from John Chastang. What considerations were addressed to the government to induce a confirmation? They were the grant made to Chastang, which had been lost, and his long continued occupation, affording evi-

dence of it. What evidence of title was shown to connect the claimants with the land? It was the will of John Chastang. On whose behalf was the claim presented? It was on behalf of the legatees under the will. How would the patent have issued under the Land Office regulations? To the legal representatives of Chastang. Instructions before cited.

The defendants in error, finally, place themselves upon an outstanding title of Baudain, and say this is superior to ours. It is shown that Baudain never, for one hour, had any possession of the land. Plumbly, without right or claim, entered in the fall of 1813, to the east of or into the enclosed lot of Chastang.

No antecedent fact to support this title of Baudain is presented. It has the support of a government confirmation, but the patent is issued with this significant saving, "subject to any just claim or claims *to all and every part thereof*, of all and *every* person or persons, bodies politic or corporate, derived from the United States, or from the British, French, or Spanish authorities. To have and to hold the same, subject to any just claim as aforesaid, so that the United States and no one claiming by, through, or under them, shall set up any claim thereto." Then there is obviously upon the face of the patent itself, a refutation of the doctrine that the Baudain claim has been established at our expense. The government has confirmed both tracts, and has provided, in a limited number of cases, for the settlement of the conflicting boundaries. In this case there is and could have been no adjudication between the rights, nor were the officers of the Land Office clothed with the powers to adjudicate such rights.

The Baudain title, however, has no connection with the defendant's possession. It is outstanding. To be available it must be operative, subsisting, such as will sustain an ejectment. This has been tried with the Baudain title and failed.

The title must be so available that the defendant could not resist it. 3 Wash. C. C. 498; 3 John. 375; 4 Dana, 561; 4 John. 202; 9 Yerger, 325; 6 John. 257. The title in a stranger is a shield to the defendant. He is permitted to

avail himself of it, but it is *stricti juris*, and must be clearly established. 6 Peters, 302–312.

PHILLIPS, *contra :*

Basil Chastang made application in May, 1813, for a confirmation.

He exhibited no title whatever, but expressed a belief that his father once had one.

In the case of Dill, decided at last term upon the same title, the court decided that the Chastangs had no title, except such as they derived from the act of 1822.

The will of John Chastang, executed in 1805, was filed, not for the purpose of asking the government of the United States to examine into its provisions, to approve or disapprove of its limitations, or in any manner to take cognisance of its trusts or its conditions, but simply to show the Land Officers the warrant or letter of attorney, by which Basil Chastang considered himself as justified in presenting himself as the claimant.

He states in his application, that he acts for "himself and the other legatees therein named," and the prayer of the petition is, that as "executor aforesaid, *he* may be confirmed in his claim to said lot."

The 5th section of the act of 1812 defines the duty of the commissioners, to the investigation of the validity of the claim. U. S. Stat. 2 vol. 715.

The character of the will, therefore, was a matter of no sort of consequence to the government, nor can it be supposed in making a grant, to have any reference to its provisions.

Whether the limitations of the will were such as would be supported in the State Courts or not, are inquiries which the government never intended to make, but they pass the title to the individual reported to Congress as the claimant, and leave questions as to the rights of property between parties to be settled by the State tribunal.

The opposite view is, that Congress, in legalizing the claim, approves also the titles or authority under which the claimant appears, and in this case, not only made a grant of title in 1822, but made it to take effect as provided for by the will of 1805.

Suppose the will to be opposed to the laws of the State.

Suppose it invalid to pass an estate, in not complying with legal requisitions as it is in this very case, is the act of Congress to give it validity, and thus override State authority?

The claimant does not ask that a grant may be made, to conform to the provisions of the will; but that as executor, he may be confirmed in his claim. Having obtained the confirmation, the laws of the State would have compelled him, if the will was valid, to permit the property to be enjoyed as it directed.

The case stands in the same position, as if Basil had made an application in right of his father, or as executor of his father, without filing the copy of the will. In either case the title flows from the government upon the actor in the land office, the claimant, and the rights which lie behind this are settled by the State tribunals.

It is the claimant, and not the party really in interest, who takes the title. Strother v. Lucas, 6 Pet. 763; Same case, 12 Pet. 458; Stoddard v. Chambers, 2 Howard 316; Russell v. Penrose, 8 Howard 338; La Roche v. Jones, 9 Howard 170.

Not only was the report in favor of Basil as claimant, but the patent certificate issued in his name, and upon this certificate if a patent had ever issued, it would have conformed to the certificate.

Under this act and patent certificate, can it be denied, that Basil could have maintained his action of ejectment against a stranger? Could he have been defeated by showing an outstanding life estate in Louison, or after her death, by proving there were other heirs entitled?

It seems to me, as against all the world he held the legal title, and as against those who were interested under the will, he held the title subject to their equities.

In the case of Hall v. Root, 19 Ala. Rep., the claim was made by Thos. Dunn, in right of his father Cornelius Dunn. Before the claim was acted on, Thomas died. The claim was revived by Thomas Byrne, the son-in-law, and he conveyed to Root; the point was made that the confirmation was in law to the heirs of Dunn, but the Court overruled the objection, and held the legal title to been vested by the confirmation in Byrne.

Suppose the government had issued a patent reciting that Basil had made an application on behalf of himself and the other legatees, and in consideration thereof, had vested the legal title in said Basil, to be held for his use as well as for the use of his co-legatees, would not Basil have been invested with a legal title to have enabled him to maintain ejectment?

The legal title passed by the act, but with the condition annexed that it might be located by the Register and Receiver under 5th sec. of act of 1822, and the State Court can exercise no jurisdiction upon the location so determined.

The letter of the commissioner, July, 1824, in reference to the city map of Mobile, stating that he had determined not to issue any more patents until "the land officers shall have decided upon interfering or conflicting claims." 2 Vol. Instructions and Opinions 841; See also 741.

The title outstanding in Baudain was a complete defence, as it showed a superior title to the plaintiffs, although it might be barred as against defendant; an outstanding title is said to be one which would afford a recovery against either of the contending parties. Hall v. Gittinge, 2 Har. & John. 125.

In the case of Foster v. Joyce, 3 Wash. 501, the court say the title outstanding must be a subsisting available title, "on which the asserted owner might recover if he were the lessor of plaintiff.

So in 4 Wash. 171, it is stated that the outstanding title must be better than plaintiff's.

A title under statute in a third person, which would bar the plaintiff, if such third person were defendant, will defeat his recovery against any other person. 1 Nott & McCord 307.

Elder patent tolled in behalf of the defendant's possession. 4 B. Monroe 387.

The defendant may have no right to the property, but it is equally clear the plaintiff has no right to recover, because he has no title. 6 Mis. 335.

The right of entry destroyed by adverse possession inures to the benefit of possessor. Chiles v. Clark, 1 A. K. Mar. 582; Chiles v. Jones, 4 Dana 482; Colston v. McVay, 1 A. K. Mar. 251.

Presumptions are sometimes indulged in favor of the possession, but not against it.   Adair v. Lott, 3 Hill, 186.

Basil having been invested with the legal title by the act of 1822, was subject, from that time, to the operation of the statute of limitations, which on barring him, would also bar his *cestui que* trust.   Lewen on Trusts, 24 Law Lib. 307; 3 Pierre Williams 310.

DARGAN, C. J.—The plaintiffs rely upon the same title on which they did in the case of the Heirs of Chastang v. Dill, decided at the last term, but they did not introduce all the written evidence of title offered in that case.   In this, they have omitted the certificate of confirmation and the warrant of survey issued by the Register and Receiver of the Land Office at St. Stephens, and consequently, they rely upon the application of Basil Chastang, made to the commissioner in behalf of himself and the other devisees under the will of John Chastang, the will of John Chastang, deceased, the report of the commissioner to the Secretary of the Treasury recommending the confirmation of the claim, and the subsequent act of Congress, passed the 8th of May, 1822, by which the claim was confirmed.   The defendant again insists, that the plaintiffs have failed to show such a legal title as will sustain the action of ejectment.   We, however, think it is the act of Congress that gives the title, and not the subsequent location and survey which the Register and Receiver was authorized to make under the fifth section of that act. The plaintiff's claim is of that class which is confirmed by the third section of the act; that is, a claim that had passed through the office of the commandant, and founded, as the claimant supposed, on a grant that was lost.   The third section of the act, referring to such claims, declares, that they " *shall be confirmed in the same manner as if the titles were in existence.*" Now I take it, that the true meaning of the word "confirmed," as here used, is to make make good, *or establish ;* the claim, therefore, which before the act was invalid, is thereby made good and valid.   The question might be asked, from what time did Congress conceive that the validity of the claim would date ?   The answer would be, from the time of the passage of the act.   It was this that gave validity to the

claim; and I see nothing in the act from which it can be inferred, that its validity was intended to be deferred or postponed, until a subsequent period; and if it was the intention of Congress, to make the claim valid from the date of the act as against the government, it was at that period of time that the plaintiffs received a title, the character of which is precisely the same, as if the original grant (supposing one to have been obtained by the applicant, which had been lost,) had been in existence. Consequently, the title thus derived under the act of 1822 is a legal title as contra-distinguished from an equitable title. This view I think in accordance with several decisions of the Supreme Court of the United States.

In the case of Farmer's Heirs v. Eslava, 9 How. 421, the plaintiff's title consisted of a claim founded on a French grant to Groudel, bearing date in 1757. Groudel conveyed to Guichandene, who sold to Count Pascher, who, by deed alleged to be lost, conveyed to Robert Farmer. This claim was presented to the commissioners by the heirs of Farmer, who, by their report, recommended its confirmation, and the plaintiffs insisted that it was confirmed by the act of 1822. The plaintiffs also showed, that a certificate of confirmation had been issued by the Register and Receiver of the Land Office, and the claim located and surveyed, after which a patent regularly issued to the plaintiffs, professing to convey such title as the government then had in the premises, subject however to all just claims derived from the government of the United States, or from the Spanish, French or British authorities.

The title of Eslava consisted of a Spanish concession, dated in 1788, granted to Elizabeth Fonnerette, who conveyed it to Fontennella, who sold to Orsona, and Orsona conveyed to Eslava. The claim of Eslava had been presented to the commissioner, who reported it as one that had passed through the office of the commandant, and recommended its confirmation. This claim was confirmed by the third section of the act of 1822, as one founded on a grant that had been lost. He also showed a certificate of confirmation issued by the Register and Receiver, and further, that the claim had been located and surveyed, but no patent had been issued to him; nor did it appear that he had ever applied for one. The Su-

preme Court, confining its decision exclusively to the titles derived from the United States, said, "Both claims were confirmed by Congress at the same time ; the former then is no better than the latter." This language, as well as the entire opinion delivered in the case, shows that the Supreme Court considered that it was the act of Congress of 1822 that gave the title, and not the subsequent location and survey, or patent issued thereon; and as the claims of both parties to the same lot were confirmed by the same act, the one could not, by virtue of the title thus derived, claim superiority over the other; for both titles dated from the same period of time, and both were derived from the same authority. This decision is sustained by the cases of Stoddard v. Chambers, 2 Howard, 307, and Chouteau v. Eckart, ib. 344. Indeed it cannot be doubted, but that a title may as well pass by an act of Congress, as by an act of a ministerial officer of the government; and when a claim is presented to Congress and is confirmed, its validity as against the government must date from that period. And if there is nothing in the act itself that would show that the title did not then pass to the claimant or confirmee, we should hold that the title thus derived was a legal one, which would sustain the action of ejectment, if the particular land, the title to which was confirmed, could be identified or ascertained by proof *aliunde*. See Ladiga v. Roland, 2 How. 581.

Nor does this construction conflict with the fifth section of the act, which gives to the Register and Receiver authority to direct the manner in which the claims to land thereby confirmed should be located and surveyed, and also to decide between the parties in all cases of conflicting claims. These locations and surveys were not only necessary to give the claimants convenient evidence of title, but when the claim did not show the quantity of land claimed, nor the boundaries by which the quantity could be ascertained and the particular land identified, they became indispensable, in order to fix the title to the precise land granted by the confirmation. But when the claim shows the quantity, and the identity of the land can be ascertained, then the location and survey are not indispensable, for it is the act of Congress, and not the subsequent location, that gives the title. We therefore must hold, (applying this test to the plaintiff's claim,) that the title

derived under the act of the 8th of May, 1822, is a legal one on which an action of ejectment may be brought.

But it is again insisted, on the part of Armstrong, that the title derived under the act of Congress vested in Basil Chastang, and not in the devisees of John Chastang, according to the provisions of his will.

It is true that the legal title, by these acts of confirmation, vests in the claimants, for it is in their favor the act was passed, and the legal title passing from the government by the act, it can vest only in the person who was designed to take. Independent of all authority, this seems to be self-evident; but the question is well settled upon authority, Bissell v. Penrose, 8 How. 317; Laroche v. Jones, 9 How. 170; Strother v. Lucas, 6 Peters, 763; 12 Peters, 458; 2 How. 316. This proposition, however, does not solve the question. The inquiry still is, who is the claimant in the case before us? To answer this inquiry, we must ascertain what constitutes the claim, and by whom or in whose favor was it presented; then, applying the act of confirmation to the claim thus presented, we shall be able to discover in whom the legal title is vested. The claim, as I understand it, is the right, title or interest, propounded by the applicant to the Commissioner, in reference to which he was required or authorized to take evidence, and report his opinion thereon to the Secretary of the Treasury. His report upon the claim cannot be said to be the claim itself, but rather his opinion or conclusion in reference *to it.* The claim, then, consisting of the right or title presented to the Commissioner, it follows, that the claimants are those who are alleged in the application to him to have that right or title, and the act of Congress confirming the claim vests the title in the claimants, according to their interest as propounded to the Commissioner. I, therefore, feel satisfied that the title granted by the act of 1822, upon the application of Basil Chastang, vested not only in him, but in all the devisees of John Chastang, deceased, according to the provisions of his will; for the application or claim was not presented by Basil Chastang for himself alone, but also in behalf of all the other devisees under the will of his father; they, therefore, were all claimants, though their claim was presented by Basil Chastang alone, and the act inured to the

benefit of all.  We come, therefore, to the conclusion that the plaintiffs have shown a legal title, on which an action of ejectment may be sustained, and in order to defeat recovery, the defendant must show a better, or at least an equal title, either in himself, or outstanding in another; and this leads us to consider the evidence of title offered by the defendant.

To show title in himself, the defendant proved that the lot in controversy was occupied by one Plumley in 1813, who had taken a lease for it from one Pollard, but Plumley disclaimed the tenancy, and asserted title in himself.  In 1814 Plumley sold the lot to Schaffer, who entered into possession and commenced erecting a building, but died shortly afterwards.  Carman Frasee intermarried with the widow of Schaffer, and completed the house.  After the death of Mrs. Frasee, her son and heir at law sold the lot to one Raizor, who also died, and the lot was again sold by order of the County Court of Tuskaloosa, and was purchased by Daniel Dill, who sold it to the defendant.  The defendant also read in evidence the application of Carman Frasee for the lot, made to the Commissioner, his report thereon to the Secretary of the Treasury, and also the act of Congress of 1822, and insisted that it was confirmed thereby.  But the record does not disclose the character of this claim, nor the report of the Commissioner made thereon; we, therefore, cannot judge of its validity as a title, and will dismiss its consideration without further remark.  The defendant also read in evidence a Spanish concession, granted to Henry Baudain, bearing date in 1798.  This claim of Baudain had been presented to the Commissioner, who made a favorable report thereon, recommending its confirmation, and then read the same act of Congress showing that it had been confirmed.  The defendant then proved that the Register and Receiver had, under the authority of the fifth section of the act, located and surveyed this claim in the year 1823, whereupon a patent was issued to Baudain in the year 1837.  It was also proved that the *locus in quo* was within the claim of Baudain, and was covered by the patent.  But it was shown that the claimants under the patent of Baudain had brought an action of ejectment in 1838, against the then tenant in possession, but had been defeated on the ground that the tenant, and those through whom he

claimed, had had the adverse possession of the lot for more than twenty years. Upon this evidence, the court instructed the jury that the defendant could not set up the title of Baudain, though *perfect* within itself, because it was not a subsisting title against the defendant, being barred as to him by the statute of limitations.

We all agree that this charge was erroneous. We have seen that the plaintiff's title, as well as the title of Baudain, is derived from the same source, to wit: the government of the United States. They both commence at the same point of time, and from the same authority; and if it be true that the title of Baudain is perfect within itself to the *locus in quo*, it would follow as a necessary sequence, that the plaintiffs have no title to the lot sued for. They derive title under the act of 1822, and of course can take only such title as that act gives them. Baudain derives title under the same act, and if he acquired the title to this lot, then the plaintiffs could not; for the Federal Government had but one title, and if this was imparted by the act to Baudain, it could not be given to another. By showing, therefore, a perfect title in Baudain, the defendant showed an absence of all title in the plaintiffs.

But no question was made in the court below upon the comparative merits of the two titles. The court assumed that the title of Baudain was perfect, and we, therefore, have examined this case upon this assumption, *without* intending to say which title, that of the plaintiffs or that of Baudain, is superior; or rather, as between them, who has the title to the lot in controversy. That question can only be properly decided, when it is made the point in the court below on which the case turns; but, as the case now stands, the court below thought it unnecessary to decide between the two titles, and we think it improper for us to do so.

This view renders it unnecessary to decide the question touching the statute of limitations; for if the title of Baudain should be found the better, it will prove that the plaintiffs have none, and if the title of the plaintiffs be superior to that of Baudain, still no question touching the statute of limitations can arise, for the defendants will then fail to show a superior outstanding title.

Let the judgment be reversed, and the cause remanded.