# REPORTS

OF

# CASES ARGUED AND DETERMINED

AT THE JANUARY TERM, 1863.

## DOE, ex dem. MIMS' HEIRS vs. HIGGINS.

[EJECTMENT.]

1. *Spanish land titles; claim of Samuel Mims' heirs, as confirmed by act of congress approved March 2, 1829.*—The claim of the heirs of Samuel Mims, which was an incomplete Spanish title, was confirmed by the act of congress approved March 2, 1829, (4 U. S. Statutes at large, 358,) "to the extent recommended for confirmation in the report" of the register and receiver, and was recommended for confirmation in that report "in the same manner as if the titles were complete"; but neither the original Spanish concession, nor the petition on which that concession was founded, specifies the location, quantity, or boundaries of the grant, nor otherwise sufficiently designates it; consequently, no title to any particular tract or parcel of land vested in the claimants by virtue of the confirmatory act of congress; and neither the description of the claim given in the report, nor the survey and plat which was made; under the direction of the register and receiver, pending their investigation of the claim, (but which was never approved by them, nor made part of their report, nor referred to therein, nor shown to have been brought to the knowledge of congress, and which is inconsistent with the report itself,) remedies or supplies this defective description.

2. *Same; location of said claim by executive officers.*—The several acts of congress approved respectively on the 4th July, 1836, the 2d March, 1829, and the 3d March, 1819, (5 U. S. Statutes at large, 107, § 1; 4 *ib.* 358, § 6; 3 *ib.* 532, § 12,) conferred on the commissioner of the general land-office authority to revise the acts of the subordinate government officers engaged in the survey and location of the public lands; and he having decided that the claim of the heirs of Samuel Mims, as confirmed by the act of 1829 above cited, did not cover the area upon

1

which it was located by the subordinate agents of the government, that the location and survey were erroneous, and that no patent should issue to the claimants unless otherwise directed by a court of competent jurisdiction,—the survey of the claim by Henshaw in 1835, and the patent certificates afterwards issued by the register and receiver, were annulled by the said decision of the commissioner, and, consequently, did not vest in the claimants any title whatever to the particular tract of land on which their claim purported to be thereby located.

APPEAL from the Circuit Court of Mobile.
Tried before the Hon. C. W. RAPIER.

THIS action was brought by the heirs-at-law of Samuel Mims, deceased, against Benjamin Higgins, Stephen Twelves, and others; was commenced on the 9th April, 1851, and sought to recover a tract of land in the city of Mobile, which was described in the declaration as being "bounded east by Royal street, south by State street, north by the Orange Grove tract, and west by St. Joseph's street." The plaintiffs claimed the premises under a Spanish concession, dated the 12th August, 1796, to their ancestor, Samuel Mims; the confirmation of that title by the act of congress approved March 2d, 1829; a survey by Henshaw, deputy-surveyor, in 1832, and two patent certificates issued by the register and receiver of the land-office at St. Stephen's, one dated the 27th March, 1835, and the other on the 20th September, 1850. The opinion of the court contains a full description of their title, as shown by the documentary evidence and the provisions of said confirmatory act of congress, and renders it unnecessary to give a further statement of it in this place. The defendants also claimed under Spanish titles, as confirmed by act of congress in 1822, which require no particular notice; and they read in evidence, for the purpose of impeaching the plaintiffs' title, a certified copy of a letter addressed by the commissioner of the general land-office to the register and receiver of the land-office at St. Stephen's, which was in the following words:

"General Land-Office, May 7, 1853.

"Gentlemen: In the case of the claim of the heirs of Samuel Mims and certain conflicts therewith, this office ad-

dressed communications to the register and receiver, under date of October 31, 1850, 5th August last, and 5th ult.; and since then the following described papers have been received at this office: (1st,) register and receiver's report, dated the 22d February last, received 11th ult.; afterwards, their letter of that date, with list of papers, and also the papers themselves, being—(2d,) transcript of the claim of Mims, as found of record, with the proceedings of the commissioners; (3d,) copy of the plat and survey of the claim of Mims by Andrew Henshaw, dated the 30th May, 1832; (4th,) extract from minutes of the board, Hazard and Owen; (5th,) copy of notice to Messrs. Douglass & Thompson, authorizing them to take testimony; (6th,) interrogatories by Jno. A. Campbell; (7th,) objections to jurisdiction of register and receiver, by counsel for heirs of Mims; (8th,) testimony taken by commissioners; (9th,) copy of the translation of the claim of Mims, by Caro; (10th,) copy of survey by Andrew Henshaw, of the claim of Mims, exhibiting the conflicts as laid down on surveyor-general's map of Mobile. We also received, on the 20th ult., from Jno. A. Campbell, (11th,) transcript, certified by the register, of the record in the case of James Innnerarity, under James Brady (cert. No. 3), being claim No. 38 in Crawford's report No. 4; (12th,) do. in case of John Forbes & Co., under Cornelius Dunn, (cert. No. 23,) claim No. 26 in said report No. 4; (13th,) do. in case of W. E. Kennedy, under John Baker, (cert. No. 42,) being claim No. 47 in said report No. 4; and with register and receiver's letter, of the 8th ult., we have received (14th) protest of Jno. A. Campbell.

"The claim of the heirs of Samuel Mims, in right of Samuel Mims, is entered as No. 1 in the commissioners' (Hazard and Owen) report, ' D, No. 1 ', transmitted by them on the 29th February, 1818, (see American State Papers, *Public Lands*, D. Green's edition, vol. 5, pages 122 and 119,) and confirmed by the act of congress approved March 2d, 1829.—U. S. Statutes at large, vol. 4, page 358, ch. 40. This claim was before this office, on the transmission, under date 15th September, 18 50, of the patent certificate for the Mims claim according to Henshaw's survey of 1832, which covered several other claims not noticed in the said patent

certificate. The matter was accordingly remanded, under date October 31, 1850, for examination and report; and the case is now before us on the register and receiver's report of the 22d February, with accompanying papers; in which report they conclude as follows: 'On a full review of the whole case, the undersigned find much unaccountable difficulties to reconcile, and, on a careful examination, are compelled to give as their decision that, on the principles of justice, the present location and survey of the claim of Samuel Mims, as made by Andrew Henshaw, dated the 30th May, 1832, and approved by the surveyor-general, James H. Weakley, be allowed, reserving to the adverse claimants before mentioned the location and surveys of their several claims, as exhibited on the approved map of the town of Mobile filed in this [St. Stephen's] office'; and which they request may be considered a part of their report.

"The adverse claims thus referred to are—1st, James Innerarity, under James Brady, cert. No. 3, (claim No. 38 in Crawford, No. 4;) 2d, John Forbes & Co., under Cornelius Dunn, cert. No. 23, (claim No. 26, Crawford, No. 4;) 3d, W. E. Kennedy, under *John* Baker (*Joshua* in report), cert. No. 42, (claim No. 47, Crawford, No. 4;) 4th, John Forbes & Co., under Constantine McKinney, cert. No. 22, (claim No. 25, Crawford, No. 4;) 5th, John Forbes & Co., under James Brady, cert. No. 1, (claim No. 23, Crawford, No. 4.) It is also represented, that Henshaw's survey, of 1832, for Mims, conflicts with the Price claim, as patented in 1837; and on examination of the record it is found that it is excepted from that patent. It now becomes necessary for us to consider the question as to the correctness of the Henshaw survey of 1832; for, if correct, the patent certificate and plat according to that survey should be ordered up, and followed by a patent; and if not, we cannot, in the faithful execution of the laws, issue a patent according to that survey.

"Let us turn, then, to the report of Hazard & Owen, in 1828, in this case. We find it purports to be an 'abstract of claims to lots in the town of Mobile, founded on orders of survey, requettes, permissions to settle, or other written evidence of claim, derived from the French or Spanish au-

Doe, ex dem. Mims' Heirs v. Higgins.

thorities, presented to the commissioners appointed under the act of congress of the 3d of March, 1827, entitled,' &c., 'and recommended for confirmation in the same manner as if the titles were complete.' The body of that report, or abstract, designates the claim as a 'Spanish permit'; dated '12th August, 1796'; granted by 'Baron de Carondelet'; 'quantity, four hundred and thirty-eight, by two hundred and twenty-two feet'; 'on Royal street, Mobile'; 'no survey'; 'built upon in 1797'; with the remark, that 'this grant contains a condition, which requires that the lot should be built upon within one year of its date, and it appears from the testimony that the condition was complied with'. It will be observed, then, that the quantity was referred to in said report as four hundred and thirty-eight, by two hundred and twenty-two feet; but there is nothing found in the Spanish permit, dated 12th August, 1796, to Mims, giving any such area to the lot. The transcript (2d) shows, that Samuel Mims, on the 23d July, 1796, petitioned the governor-general for 'the first one [lot] going up said Royal street which is vacant, bounded on the south by a new street, and on the north by land of the King'. On the 1st August, 1796, Pedro Olivier certified the lot to be vacant; and Carondelet, on the 12th August, 1796, ordered the petitioner to be put 'in possession of the lot he prays for, situate as described in the preceding memorial, if it be vacant, and not to the injury of those being adjacent, under the express condition of building on said lot within the precise time of one year'.

"We find further, on examining transcript (11), page 3, that on the 6th November, 1804, James Brady addressed a petition to the Spanish commandant, stating that his 'brother-in-law, Samuel Mims, has a lot in this place, situated on Royal street, bounded on the north by a lot belonging to Mr. Cornelius McCurtin, and on the south by a vacant lot; which lot was granted by Baron de Carondelet, governor-general and intendant of the province of Louisiana and West Florida, in the year 1796, as appears by the concession therefor'; and, 'as his said brother-in-law has transferred to the petitioner the said lot, with the privilege of building thereon', he asked to be permitted 'to possess and

build on said lot'. Osorno, the Spanish officer, states (page 3) on the 7th November, 1804, that, 'it being true that Samuel Mims has transferred to the petitioner the lot mentioned in the memorial', he gives him 'permission to build thereon, and to enclose it'. This lot then passes by sale to James Innerarity, who applies for its confirmation under James Brady, (No. 38 in Crawford's report, No. 4,) and it is laid down on the map of Mobile in said Innerarity's name, (certificate No. 3,) being the 'first lot north of Anthony street, cornering on the east the old line of Royal street'. *Next north*, and adjoining this, is a lot laid down in the name of John Forbes, (it should be John Forbes & Co.,) certificate No. 23. This, it appears, was claimed under Cornelius Dunn; and the transcript (12) shows that, on the 22d July, 1796, Cornelius Dunn memorialized the governor-general, stating that 'he needs a lot, and, having found a vacant one, at the northern extremity of this town, situated on Royal street', he entreated his excellency to grant it to him, 'it being contiguous to the one solicited by Samuel Mims, with the same dimensions, fronting on Royal street', &c. Pedro Olivier reports, on the 1st August, 1796, as he had done under same date in the case of Mims, that the lot was vacant, &c.; and Carondelet, on the same day that he made his grant to Mims, made his grant also to Dunn.

"The third, and next lot, north, in the tier, is the one in the name of W. E. Kennedy, under John Baker, No. 42. From the transcript it appears that, on the 16th April, 1798, John Baker petitioned the governor-general for 'a lot of ground situated on Royal street, being vacant, of twelve toises front, by twenty deep, bounded on the north side by vacant lands, and on the south by that belonging to Cornelius Dunn; the which, to the present time, has never had a proprietor'. On the 17th April, 1798, the Spanish officer, de Lanzos, certified to the governor-general that 'the lot solicited, from the information' he had taken on the subject, 'belongs to the royal domain, and does not pertain to any individual person'. Accordingly, Governor Manuel Gayoso de Lanzos orders the party interested to be established upon the lot; and Kennedy, under Baker, is entered as No.

47 in Crawford's report, No. 4. Now, here we have a grant from Carondelet, of 12th August, 1796, to Mims; one of same date, from same officer, to Dunn, calling for Mims as a boundary; and then a grant to Baker, in 1798, calling in turn for Dunn as a south boundary. The two contemporaneous acts of August 12, 1796, of the Spanish governor, and the third within two years thereafter, furnish evidence, in my judgment, inconsistent with the location by Henshaw for Mims, which extends from Anthony street on the south, to the south boundary of the Orange Grove tract on the north; and the grant to Brady, in 1804, seems to fix the true location of the Mims lot to that laid down in the name of James Innerarity under Brady, (cert. No. 3,) who claimed the lot as Mims' property, and whose transfer to Brady is attested by the certificate of the Spanish officer (Osorno) in 1804.

"If this view of the case be correct, (and I am of opinion that it is,) it results, that the original lot of Mims is within that confirmed to James Innerarity, and the confirmation of the act of March 2, 1829, operates as a second confirmation of the same land, but in favor of the heirs of Samuel Mims, who are the present claimants, in Hazard & Owen's report of 1828. If that report represented the claim of Mims as based, not only upon the Spanish permit of 1796, and the fact of its being built upon in 1797, but also upon further written title, and possession for expanded limits, then the act of March 2, 1829, should undoubtedly be construed to cover the claim according to the utmost extent of its foundation, old and new. But this is not the case. The report does not go an *iota* beyond the Spanish permit of 12th August, 1796, and the building in the Spanish times of 1797; for it recommends the claim 'in the same manner as if the titles were complete', and the act of 1829 confirms 'to the extent therein recommended for confirmation'. The effect of the report and confirmation is just to confirm the lot according to what it was in Spanish times, and as if the title had been then complete; nothing more. In my opinion, there is nothing that would warrant us in allowing the mere arbitrary area, mentioned in the report of 1828, to control and override 'the written evidence of

the claim, therein specially designated as derived from the Spanish government on the 12th August, 1796, and which, in connection with the performance in 1797 of the condition of the grant, by building in that year, constitutes the only foundation of the claim, the limits of which, by contemporaneous and other acts, during the continuance of the Spanish power, is well established. The survey, however, was made by the deputy-surveyor, Henshaw, in 1832, pursuant to the order of the register and receiver, acting under the 5th section of the act of March 2d, 1829, and so much of the 4th section of the act of May 8th, 1822, as is not inconsistent with the said act of 1829. Yet, as, in our judgment, that survey is not in accordance with the claim as confirmed, we cannot carry it into patent, unless it shall be otherwise decided by a court of competent jurisdiction.

"You will make known the foregoing to all parties interested," &c.

(Signed) "John Wilson, Commissioner."

The court charged the jury (among other things) as follows: "If the lands confirmed to the defendants, or those under whom they hold, by the act of congress of 1822, are included in, or are parcels of, the tract located and surveyed as the Mims claim by Henshaw, the United States deputy-surveyor; then, the documentary proof introduced, and the several acts of congress read in evidence, show a title to the lands so confirmed to the defendants, or those under whom they hold, paramount to that of the plaintiffs."

The plaintiffs excepted to this charge, and requested the court to instruct the jury—

"1. That the claims set up in this action were all of the class called inchoate and incomplete at the time the United States acquired the country, and so remained until confirmed and located by approved surveys made under the authority of the government.

"2. That the location by approved survey was the final act, which severed these private claims from the public domain, and first vested a legal title in the claimants.

"3. That the oldest claim, and the oldest location and approved survey under the government, is the superior and paramount title.

"4. That of the claims presented in this suit by documentary proof as legal titles, the Mims claim is the oldest and paramount."

The court refused each of these charges, and the plaintiffs excepted to their refusal; and they now assign as error the charge given, the refusal of the charges asked, and several rulings of the court on questions of evidence to which they reserved exceptions.

K. B. SEWALL, for appellants.

R. H. SMITH, and THOS. A. HAMILTON, *contra*.

(No briefs have come to the hands of the Reporter.)

A. J. WALKER, C. J.—The plaintiffs' claim originally belonged to the class of incomplete Spanish concessions, which, after the acquisition of the territory by the United States, were addressed to the liberality and justice of the political department of this government. No title vested until the concession was confirmed by congress.—*Menard's Heirs v. Massey*, 8 How. 306; *Les Bois v. Bramell*, 4 *ib*. 464; *Doe, ex dem. Chastang v. Dill*, 19 Ala. 421. Whatever right the plaintiff may have, cognizable in a judicial tribunal, is derived from the act of congress, acting upon the Spanish concession, and the subsequent proceedings of the executive officers under the authority of law.—*Willot v. Sandford*, 19 How. 79.

By the first section of an act of congress approved March 2d, 1829, a claim in favor of the plaintiffs was confirmed.—4 U. S. Satutes at large, 358. If the plaintiffs have a title to the particular land in controversy, it must either be bestowed by that act of congress, or result from that act and the subsequent proceedings of the proper officers of the general government. Whether, in either of those modes, a title to the *locus in quo* has vested in the plaintiffs, we proceed to inquire.

1. Does the act of congress, by its own intrinsic force, clothe the plaintiffs with a title to the particular area in litigation? The section of the act of congress above cited enacts, that certain claims, described in a report of the register and receiver at St. Stephen's, "be confirmed to

the extent recommended in the report" for confirmation. The claim of the plaintiffs, along with three others, is embraced in "*Abstract D, No.* 1," of the report, and is "recommended for confirmation in the same manner as if the titles were complete."—5 Am. State Papers, 122. Congress confirms to the extent recommended, and a confirmation as if the titles were complete is recommended. The confirmation by congress thus refers to, and is limited by, the recommendation. Its effect is to place the claim, predicated upon the Spanish concession, in the situation at the date of the act of congress in which it would have stood if the concession had been a complete title. It converts the Spanish concession, from that date, into a complete title. The same view was taken by this court, in *Chastang v. Armstrong,* (20 Ala. 623,) of the operation of an act, by which claims were "confirmed in the same manner as if titles were in existence."

Congress has confirmed the title to that land embraced in the concession. The land for which Samuel Mims, the plaintiffs' ancestor, petitioned on the 22d July, 1796, and which was granted by the governor-general, Baron de Carondelet, on the 12th August, 1796, was described as one of the vacant lots towards the north on Royal street, "with the accustomed dimensions, the first of the vacant ones there is going up the said Royal street, which is bounded on the south by a new street, and on the north by the lands of the dominion." The petition of Benjamin F. Smoot in behalf of the plaintiffs, on the 27th May, 1827, to the commissioners for the adjustment of land claims, is not more specific in its description than the petition of Mims above stated. In the description found in the concession, neither the location, boundaries, nor quantity is defined; there is no designation of the particular land.

It is an established doctrine, in reference to confirmations of claims without identification and specification of boundaries, that the confirmation does not vest a title to any particular land, and does not clothe the claimant with any right cognizable in a judicial tribunal, but leaves him to obtain from the executive department of the government, through its officers, the location and identification of the

land.—*Chastang v. Armstrong*, 20 Ala. 609; *Ledoux v. Black*, 18 How. 473; *Menard v. Massey*, 8 How. 309; *Cousin v. LeBlanc*, 19 How. 202. The confirmation of such a claim gives a right, demandable from the political department of the government, but bestows no title to any distinct parcel of land separated and severed from the public domain. It is manifest, then, that the plaintiffs took no title by the act of confirmation, if it was made in reference alone to the description in the original petition of Mims, upon which the Spanish concession was predicated.

It must be conceded, that an act of congress might confirm a concession, in itself containing no identification, and yet might so supply the description as to completely identify and specify the particular land upon which the confirmation was designed to operate; and this, it is contended, was done in reference to the claim of Mims. As we have seen, there is nothing in the terms of the act of congress, which refers to a more definite location and description than is afforded by the concession. The same thing is true in reference to the recommendation of the register and receiver. That recommendation simply states, that Samuel Mims was the original claimant; that the nature of the claim was a Spanish permit; that its date was August 12th, 1796; that it was granted by Baron de Carondelet; that its quantity was four hundred and thirty-eight by two hundred and twenty-two feet; that it was situated upon Royal street in Mobile; that there was no survey, and that it was built upon in 1797.—5 Am. State Papers, 122. Conceding, then, that the confirmation by congress had reference to the recommendation and its specifications, it contributes nothing to relieve the claim of its indefiniteness and want of certainty as to location and boundaries.

It is said, however, that before the recommendation of the register and receiver was reported, and pending their investigation of the claim, a survey and plat of the land was made, under their direction, by William Roberts, deputy-surveyor; and that although that survey, being unapproved, had of itself no force, the recommendation, and also the act of congress based upon the recommendation,

must be referred to that survey, which fixes the location, boundaries, and area; and that the act of congress, therefore, confirms the claim, and adopts the location and description given in the plat and survey. This position cannot be maintained. The survey does not appear to have been a part of the report in which the recommendation is made, or to have been in any wise brought to the view of congress. It is not referred to in the report, and does not appear in any way to have received the sanction of the register and receiver. The area indicated in the recommendation does not at all correspond with that given in the survey; and the report, so far from affirming that it is predicated upon a survey, says that there was no survey. Upon these facts, it cannot be inferred, either that the register and receiver adopted the plat and survey, as giving locality to the land and fixing its boundaries, or that congress, in confirming the claim, had reference to the location and boundaries specified in the survey.

The question, in reference to this survey of Roberts, is not at all analogous to that decided in the case of *Bissell v. Penrose*, 8 Howard, 317. In that case, the claim was made in writing, accompanied with a survey, under an act requiring the survey to be filed. The survey was thus a part of the claim. The report upon which congress acted, contained the survey. The commissioners decided, that the claim ought to be confirmed; and congress enacted that the decision of the commissioners should be confirmed.—5 U. S. Statutes at large, 126; 5 American State Papers, 735. The decision predicated upon such a case is obviously inapplicable here. The claim asserted was according to the survey, and in like manner it was confirmed. The confirmation of the plaintiffs' claim by congress, we are compelled to conclude, had no reference to any tract of ascertained and defined location and boundaries, and, therefore, did not vest a title, as against the general government, in any particular land.

2. The second question is, whether the act of congress, and the subsequent proceedings of the officers of the government, have vested a title in the plaintiffs. By the confirmation, as has already been said, the heirs of Mims

acquired a right to have the claim located, its boundaries fixed, and themselves thus clothed with a complete title to a particular tract of land. The acts of congress provide the mode of accomplishing that object, through the agency of the executive officers. Under those acts, there was a survey by Henshaw, in January, 1835, which was approved by the surveyor-general; and in March, 1835, the register and receiver issued a patent certificate, conforming to the survey, and containing a condition, which was held to be void by this court in *Innerarity v. Heirs of Mims*, 1 Ala. 660. This patent certificate does not seem to have been at any time communicated to the commissioner of the general land-office. But, on the 20th September, 1850, a second patent certificate, omitting the void condition, but otherwise identical with the first, was granted. This last certificate was communicated to the commissioner of the general land-office, who returned the certificate, with instructions, to the register and receiver; and, after some investigation by them, and report thereupon, the commissioner, in an able opinion, with the reasoning and conclusions of which we fully concur, decided, that the claim did not cover the area upon which it was located, and that the location and survey were erroneous; and farther, that no patent should issue, unless it should be otherwise adjudged by a court of competent jurisdiction. This decision and conduct of the commissioner were equivalent to a judgment of condemnation of the survey and patent certificates referring to it. Whether or not the survey and patent certificates were avoided by the decision of the commissioner, depends upon the question, whether the latter could legally exercise a revising power in reference to those matters.

The first section of the act of congress of 4th July, 1836, entitled "An act to re-organize the general land-office," is as follows: "From and after the passage of this act, the executive duties now prescribed, or which may hereafter be prescribed by law, appertaining to the surveying and sale of the public lands of the United States, or in any wise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents under the authority of the government of the United States,

shall be subject to the supervision and control of the commissioner of the general land-office, under the direction of the president of the United States."—5 U. S. Statutes at large, 107. It is so fully settled that this act invested the commissioner of the general land-office with the authority to revise the acts of the subordinate officers engaged in regulating and disposing of the public domain, that, declining to enter upon the investigation of it, we decide, that the commissioner did have, by virtue of that act, such power as he has exercised in reference to the patent certificates and surveys before us.—*Bates v. Herron*, 35 Ala. 120; *Cousin v. LeBlanc*, 19 Howard, 202; *Bernard v. Ashley*, 18 Howard, 43; *Bell v. Hearne*, 19 Howard, 252; *West v. Cochran*, 17 Howard, 403.

But the survey here was made and approved, and one of the patent certificates was issued, before the passage of the act of 1836; and it is contended that, under that act, there can be no power of revision over acts done before its adoption. We are therefore called upon to inquire, whether the commissioner of the general land-office did not have, before 1836, the revising power which he has exercised. The 5th section of the act of 1829, which confirms the plaintiffs' claim, confers upon the register and receiver authority to direct the manner in which all claims to lands and town lots, confirmed by that or any former act of congress, should be located and surveyed. The 6th section directs, "that certificates of confirmation, and patents, shall be granted in the same manner as patents are granted for lands and town lots under former acts of congress."—4 U. S. Statutes at large, 358. The certificates of confirmation are evidently the same which we have heretofore in this opinion denominated "patent certificates." Upon recurring to the " former acts of congress," to ascertain the manner in which patent certificates and patents were granted under them, we find that the act of 1822 contains a similar provision, and that the 12th section of the act of 1819, upon the same subject, points out the manner.—3 U. S. Statutes at large, 532, and 707. That section provides, that the registers shall examine the claims confirmed, and shall make out a certificate, under such instructions as they

may receive from the commissioner of the general land-office; and that on presentation of the certificate at the general land-office, a patent shall be granted, "where it shall appear to the satisfaction of the commissioner of the general land office, that the certificate has been fairly obtained according to the true intent and meaning of this act." This provision of the act of 1819, prescribing the mode of issuing certificates and patents, is, in effect, incorporated into the act of 1829, under which the plaintiffs claim. It is impossible to resist the conclusion, that, by that provision, the commissioner of the general land-office is clothed with the authority, upon the presentation of a patent certificate, to inquire whether it was fairly obtained according to the true intent and meaning of the act, and, if he decides that question in the negative, to withhold a patent. Such authority in the commissioner necessarily includes the power to annul the acts of the subordinate officers, upon which the claim to a patent is predicated; for it would be absurd to say, that the claimant had a perfect title by virtue of acts of subordinate officers, when, because those acts were wrong, the commissioner had rightfully refused a patent. Besides, it would be utterly useless to give to the commissioner power to refuse a patent, where the certificate was wrongfully granted, if, notwithstanding his refusal, the claimant had a complete title.

In this case, the commissioner decided, rightfully as we think, that the act of congress was never designed to confirm a claim to the lands specified in the patent certificates—that the certificates were not obtained according to the true intent and meaning of the act; and he had authority so to decide. He thereupon, in the exercise of an unquestionable authority, refused a patent. Now, this authority to decide and withhold a patent is altogether worthless and vain, if, notwithstanding, the plaintiffs have a complete title. The theory of the entire law, in reference to the public lands, is, that he who acquires a title to any part of the public domain, is entitled to a patent. But, if the acts of the commissioner in reference to the patent certificates in this case do not annul them, we have a case, where a party has a title as against the government of the United States,

and yet has no right to a patent, because the commissioner, having the authority to do so, has refused a patent.

We conclude, that the location and survey, and patent certificates obtained by the plaintiffs, have been annulled, and that the plaintiffs have no title to any particular piece of land, and no right cognizable in this case.

It is unnecessary for us to look farther into the points of the case. There was no error in the charges given, nor in the refusals to charge as requested; and if there was any error in the admission or rejection of testimony, the plaintiffs have not been injured thereby, because they have no title to the *locus in quo*.

Judgment affirmed.

NOTE BY REPORTER.—The foregoing opinion was delivered at the June term, 1861.